# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EARLEEN B. MCCLEAVE, | : | CASE NO. 3:12-cv-01161-GBC |
| | : | |
| Plaintiff, | : | (MAGISTRATE JUDGE COHN) |
| | : | |
| v. | : | MEMORANDUM TO DENY PLAINTIFF'S |
| | : | APPEAL |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER OF | : | Docs. 7,8,11 |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM TO DENY PLAINTIFF'S APPEAL

### I. Procedural History

On February 26, 2009, Earleen B. McCleave ("Plaintiff") protectively filed an application for Title II Social Security Disability benefits ("DIB"), with an onset date of January 15, 2009. (Tr. 25-26).

This application was denied, and on July 13, 2010, a hearing was held before an Administrative Law Judge ("ALJ"), where Plaintiff was represented by counsel. (Tr. 10). Plaintiff and a vocational expert testified. On September 14, 2010, the ALJ issued a decision finding that

Plaintiff was not entitled to DIB because Plaintiff could perform her past relevant work as an order clerk at Williams-Sonoma in customer service for their catalogue business. (Tr. 7-21). On April 19, 2012, the Appeals Council denied Plaintiff's request for review, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-4).

On June 18, 2012, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits. Doc. 1.

On August 31, 2012, Commissioner filed an answer and administrative transcript of proceedings. Docs. 6,7. In September and October 2012, the parties filed briefs in support. Docs. 8,11. On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. On June 16, 2014, the parties consented to Magistrate Judge jurisdiction. Doc. 13.

## II.    Standard of Review

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564 (1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999); Johnson, 529 F.3d at 200.

This is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence is satisfied without a large quantity of evidence; it requires only "more than a mere scintilla" of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). It may be less than a preponderance. Jones, 364 F.3d at 503. Thus, if a reasonable mind might accept the

relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986).

To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

Moreover, the Act requires further that a claimant for disability benefits must show that he has a physical or mental impairment of such a severity that: "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

### III. Relevant Facts in the Record

### A. Background

Plaintiff alleges she became disabled on January 15, 2009 when her job was terminated due to lack of work (Tr. 25-26). Following the termination of her job, Plaintiff applied for and received unemployment compensation through June 17, 2010 (Tr. 27). In connection with her application for unemployment compensation benefits, Plaintiff informed the state that she was able to work and available to work (Tr. 28). At the time she certified that she was able to work, she testified that she

believed she would only be able to work for three to four hours a week but she did not disclose that understanding in her claim for benefits (Tr. 28, 32).

Plaintiff is a high school graduate (Tr. 28) and she previously worked full-time at Williams-Sonoma in customer service for their catalogue business (Tr. 40). Following back surgery, Plaintiff returned to her past job as an order clerk for Williams-Sonoma and was encouraged by her orthopedic surgeon to remain as active as possible. Most of her duties at Williams-Sonoma were performed while sitting down and she had the ability to change positions (Tr. 42).

Plaintiff alleges that her daughter, son, sisters and grandchildren help with her household chores (Tr. 42). She is, however, able to drive, visit with her family, go to church twice a month, and walk short distances (Tr. 169). Plaintiff uses a cane in her right hand at all times (Tr. 42-43). According to Plaintiff's Function Report, it takes her about 20 minutes to get out of bed (Tr. 168). After dressing, she goes downstairs (about 15 steps) to prepare her meals, which consist of either a microwaveable dish or a bowl of cereal (Tr. 168). Plaintiff's family assists her with the meals (Tr. 168). Plaintiff can perform light, sedentary housework, such as dusting the coffee table or knick-knacks if she is sitting (Tr. 169).

### B. Relevant Medical Evidence

### 1. Plaintiff's Medical Treatment

In January 2008, Plaintiff underwent an L4-L5 laminectomy to treat her left lower extremity radiculopathy, degenerative spondylolisthesis, L4-5, and lumbar spinal stenosis, L4-5 (Tr. 231-33). Plaintiff was discharged several days later following an uncomplicated postoperative course (Tr. 257). Several days later, she was given a prescription for physical therapy (Tr. 210).

On February 14, 2008, Plaintiff began her physical therapy and reported improvement in her

symptoms since surgery (Tr. 212). Plaintiff advised that she had low back pain and sciatica pain down her left leg prior to surgery, but was only having mild pain post-surgery (Tr. 212). She reported that she currently has some difficulty ambulating stairs but is able to complete the task (Tr. 213). She also reported a walking and standing tolerance of five minutes (Tr. 213). Plaintiff rated her pain as a "1" on a scale of 1 to 5, which correlates to mild pain (Tr. 213).

That same day, Plaintiff had her first follow-up visit with her orthopedic surgeon, Mark A. Knaub, M.D. (Tr. 241). Dr. Knaub reported that Plaintiff was doing well, although she continued to have back pain (Tr. 241). She did not report any leg pain (Tr. 241). According to Dr. Knaub, x-rays of Plaintiff's lumbar spine taken that day showed no change in the position of the implants or alignment of the spine (Tr. 241). Dr. Knaub concluded that Plaintiff was doing well clinically and radiographically (Tr. 241).

Throughout February and March, Plaintiff attended physical therapy (Tr. 216, 221-22). On March 11, 2008, Plaintiff's physical therapist, Ryan Mackey, D.P.T., reported that Plaintiff had made progress in physical therapy in all of her long-term goals with the exception of right lower extremity strength (Tr. 216). However, Plaintiff had improved in balance, strength, standing and walking tolerance, and gait pattern (Tr. 216). For instance, Plaintiff reported on March 11th that her low back pain and lower extremity pain ranged from 0 to 1 on a scale of 1 to five (Tr. 217). On that day, she further advised that she had slight right lower extremity soreness due to increased walking over the weekend (Tr. 217, 222). Furthermore, Plaintiff was able to ambulate primarily with the use of a single point cane for up to 13 minutes (Tr. 217). She showed improved stride length bilaterally and more equal weight bearing through her bilateral lower extremities (Tr. 217). She also continued to ambulate up and down steps with a step-to gait pattern independently using one rail and one single

point cane (Tr. 217).

On March 13, 2008, Plaintiff saw a clinical nurse specialist in Dr. Knaub's office and reported that her pain was a "2" on a scale of 1 to 10 (Tr. 266). The nurse indicated that the x-rays taken of her spine that day showed that the hardware was intact and that her spine was in normal alignment (Tr. 266). Plaintiff reported discomfort in her right thigh, but stated that a heating pad relieves it somewhat (Tr. 266). Plaintiff reported walking with assistance of a cane outside of the house and getting around inside of the house without the cane (Tr. 266). Plaintiff, who was not taking any pain medication at that time, also asked if she could resume driving (Tr. 266). The nurse reported that Plaintiff was doing very well overall (Tr. 266).

On April 15, 2008, Plaintiff was discharged from physical therapy at her own request (Tr. 219). The physical therapist reported that Plaintiff reported no leg pain but some low back pain after cleaning and ambulation tasks (Tr. 219). She also reported adherence to her home exercise program and a standing and walking tolerance of 15 minutes (Tr. 219).

On May 15, 2008, Plaintiff visited Dr. Knaub for her post-surgical checkup (Tr. 239). She had returned to work at that point and reported that she continues to have low back pain that is improving somewhat (Tr. 239). Dr. Knaub concluded that Plaintiff was doing well, that physical therapy had improved her symptoms somewhat, and that she could continue her activities of daily living as tolerated without restrictions (Tr. 239). At this point, she was taking Naproxyn for her discomfort (Tr. 239).

By August 2008, Plaintiff was six-and-a-half months post surgery and reported to Dr. Knaub she continued to have some pain in her low back but no leg pain (Tr. 237). Dr. Knaub concluded she was doing well overall and could continue with her activities as tolerated (Tr. 237).

One year following her surgery, Plaintiff reported to Dr. Knaub that her pain had decreased since her last visit (Tr. 235). Although she continued to have some intermittent, achy, low back pain and some sharp pain over her right lumbar spine, she advised this pain was infrequent and responded to some massaging (Tr. 235). She reported difficulty standing for prolonged periods of time due to this discomfort (Tr. 235). Dr. Knaub indicated that x-rays taken of her back that day showed she maintained alignment of her spine with mild scoliosis (Tr. 235). She also had some lucencies around her screws but no evidence of instability (Tr. 235). He reported that it was difficult to determine whether she had a solid fusion underneath the hardware, but he did not think any further treatment was needed (Tr. 235).

On August 24, 2009, Plaintiff visited Dr. Knaub and reported continued pain in her back on the right side radiating down her right flank, as well as left leg pain radiating down her thigh and calf (Tr. 326). However, Plaintiff also stated that she felt better than she did a year prior (Tr. 326). Plaintiff was using a cane to ambulate (Tr. 326). X-rays of her spine were taken that day, and Dr. Knaub concluded from the films that Plaintiff did not have a clear fusion and may have a pseudoarthrosis (Tr. 326). However, Dr. Knaub also opined that he did not believe that her symptoms were coming from the failure of fusion because she reported feeling better than she did a year ago (Tr. 326). Dr. Knaub did not feel that any treatment was necessary other than monitoring her symptoms (Tr. 326).

On February 21, 2010, Plaintiff visited Dr. Knaub complaining of low back pain that radiated down her thigh and leg (Tr. 381). Dr. Knaub noted that she does not have clear evidence of fusion on her x-rays, and therefore, her symptoms could be a result of the failure of fusion (Tr. 381). He discussed treatment options with Plaintiff, including epidural injections and possible surgery to

correct the pseudoarthrosis (Tr. 381). Plaintiff advised that she was not interested in treatment, and

Dr. Knaub concluded that he did not think her situation was dangerous in any way that would

necessitate more aggressive treatment (Tr. 381).

### 2. Medical Opinions

On May 20, 2009, Bruce Goodman, M.D., completed a consultative examination of Plaintiff

(Tr. 291-95). Plaintiff reported to Dr. Goodman that she had not improved since her surgery and

continued to have back and leg pain (Tr. 291-92). She reported living in a two-story home and

receiving assistance from her family with cooking and cleaning (Tr. 292).

On physical examination, Plaintiff had a reciprocal heel-toe gait pattern with small steps (Tr.

292). She was reluctant to attempt toe and/or heel walking independently and used a cane with her

right hand (Tr. 292). Plaintiff's straight leg-raising test from a sitting position was negative and there

was no great toe weakness (Tr. 292). Plaintiff's sensory system was normal and her patella and

Achilles reflexes were brisk and equal bilaterally (Tr. 292). From the supine position, Plaintiff

restricted straight leg-raising at forty-five degrees bilaterally (Tr. 292). She had excellent muscle

strength in all directions of both lower extremities (Tr. 292).

Dr. Goodman concluded Plaintiff could frequently lift and carry 2-3 pounds and occasionally

10 pounds (Tr. 294). He opined that Plaintiff had the capacity to stand and walk 3-to-4 hours in an

8-hour workday and sit 4 hours in an 8-hour workday with a sit/stand option (Tr. 294). Dr. Goodman

concluded that Plaintiff could occasionally bend but could not kneel, stoop, crouch, balance or climb

(Tr. 295).

On June 16, 2009, Candelasia Legaspi, M.D., completed a physical residual functional

capacity assessment of Plaintiff (Tr. 309-13). She concluded Plaintiff could occasionally lift and/or

carry 20 pounds and frequently lift and/or carry 10 pounds (Tr. 310). According to Dr. Legaspi, Plaintiff could also stand and/or walk and sit about 6 hours in an 8-hour workday (Tr. 310). Dr. Legaspi opined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (Tr. 311). In support of her assessment, Dr. Legaspi noted that Plaintiff seemed to improve following surgery and was taking appropriate medication for her impairment (Tr. 315). Dr. Legaspi concluded that Plaintiff was capable of light work (Tr. 315).

### IV.    Review of ALJ Decision

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §§ 404.1520, 416.920; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that she is unable to engage in past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason v.

Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## A.    Plaintiff Allegations of Error

### 1.    The ALJ Found Plaintiff Did Not Meet the Criteria for a Listed Impairment

Plaintiff contends the ALJ erred by failing to find that Plaintiff met the requirements for Listing 1.04(C). Pl. Br. at 9, Doc 8.

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

The ALJ reviewed the record to determine whether Plaintiff met the requirements of a listing.

### a. ALJ Review and Findings for Plaintiff's Back

"The claimant has the following severe impairment: residuals of January 30, 2008 laminectomy including pain." (Tr. 12).

"The claimant has a history of treatment for low back pain including surgical intervention in the form of a laminectomy on January 30, 2008." (Tr. 12).

"The claimant's residuals of January 30, 2008 laminectomy including pain does not meet the requirements of Section 1.04 of the Listing of Impairments, as there is no indication in the record that this condition results in nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, positive straight leg raising (sitting and supine), spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication." (Tr. 12).

"Regarding activities of daily living, she reported in the record that her daughter now does all of the cooking and cleaning for her even though her daughter has her own home. She also stated in the record that a trip to the grocery store would put her in excruciating pain and indicated that her daughter does this for her. She stated in the record that she wakes up, lies in bed for about twenty minutes trying to focus on how to move into a comfortable position to get out of bed with minimal pain, and then sits on the side of the bed for another few minutes trying to regroup. She added that she then finds herself shuffling (moving cautiously) into the bathroom to wash and use the bathroom. She stated that in order to take a shower, she must sit on her medical bench with handles because standing aggravates her back and her legs may go out. She stated that she dresses herself and then goes downstairs about fifteen steps (usually twice daily) to prepare her meals. She indicated that her meals are usually microwaveable ones or a bowl of cereal as she is unable to prepare meals as she used to because of the standing and the pain. The claimant reported that she cannot clean her house, grocery shop, take her grandchildren to the park, travel, or prepare family dinners. She reported that she has problems with personal care and stated that she uses a "grabber" to put on socks and shoes and that she must sit on a medical bench to bathe. She also stated that she must sit to do her hair or her daughter does it for her. She also indicated that she has an over the commode attachment that she uses for support. The claimant noted that meals consist of sandwiches and frozen dinners and that her family brings dinner over daily. She reported that she can dust as long as she is sitting and noted that her family assists her with housework, cleaning, laundry, ironing, and household repairs. She stated in the record that she drives but usually only short distances to a drive through ATM or to a fast food restaurant drive through. She noted that she usually does not go out alone and stated that she grocery shops with her sister or daughter and added that she rides the motorized cart in the store.

She indicated that <u>she shops once a month and that it takes about one hour</u>. The claimant indicated that hobbies and interests include watching television. As for social activities, she indicated that she talks to her family, that her family comes over to visit, and that <u>her family takes her out to dinner once a month and that she always has a cane with her</u>. She additionally indicated that social activities include attending church and stated that she goes to church twice a month." (Tr. 14-15) (emphasis added).

"A February 16, 2009 lumbar spine X-ray report did show persistent but unchanged lucency around the pedicle screws at L4. It should also be noted that Mark A. Knaub, M.D., the claimant's treating orthopedic surgeon, reported on this date that the claimant was <u>one year out from lumbar decompression and fusion with instrumentation and noted that overall she was doing well with decrease in her pain and that she continued to complain only of some intermittent achy low back pain</u>. It was noted that her pain tends to respond to just some massaging. Upon examination, she had no areas of tenderness to palpation throughout the thoracolumbar spine, <u>she had 5/5 strength in all muscle groups in her bilateral lower extremities</u>, and sensation to light touch was intact in all dermatomes. Dr. Knaub noted that she had some lucencies around her screws but no evidence of instability. <u>Dr. Knaub indicated that she was doing well clinically and that he did not think that he needed to do anything further at this time</u>." (Tr. 16) (emphasis added).

"As for the clinical and laboratory findings, a physical therapy progress update of March 11, 2008 states that she made progress in all long term goals with the exception of right lower extremity strength, which was likely due to the fact that she reported mild pain in the right leg. This contradicts the claimant's assertion that physical therapy was of no benefit. It is also interesting to note that <u>a physical therapy discharge summary of April 15, 2008 states that the claimant requested to be discharged from physical therapy and that when last spoken to, she indicated that she was having no</u>

<u>pain within her legs but merely continued to have some low back pain after cleaning and ambulation</u>

<u>tasks</u>. It is interesting to note that she reported back pain after cleaning since she testified and stated in the record that others assisted her with her cleaning / housework." (Tr. 16) (emphasis added).

"Bruce Goodman, M.D., performed a consultative orthopedic examination of the claimant on May 20, 2009. <u>Dr. Goodman noted that the only drug she was taking now by prescription was</u> <u>Naproxen</u>. Upon physical examination, she was five feet three inches and weighed 207 pounds, <u>she</u> <u>had a reciprocal heel-toe gait pattern with small steps, there was normal lordotic curve without any</u> <u>paravertebral muscle spasm, she had negative straight leg raising from the sitting position, there was</u> <u>no great toe weakness, sensory examination was normal, the patella and Achilles reflexes were brisk</u> <u>and equal bilaterally, and there was excellent muscle strength in all directions of both lower</u> <u>extremities in the absence of fasciculation, weakness, or atrophy</u>. While a lumbar spine X-ray of August 24, 2009 revealed lucency around L-5 screws, it [was] noted that this was unchanged. <u>Dr.</u> <u>Knaub reported on this same date that she feels better now than she did a year ago, that strength in</u> <u>the lower extremities was 5/5 throughout</u>, and that sensation to light touch was intact throughout her bilateral lower extremities. Dr. Knaub noted that there was nothing to do other than monitor her symptoms. On February 19, 2010, Dr. Knaub reported that straight leg raising was negative bilaterally, strength was 5/5 throughout the lower extremities, and sensation was intact to light touch throughout the bilateral lower extremities. Dr. Knaub discussed treatment options with the claimant including the possibility of epidural injections as well as the possibility of surgery to correct pseudoarthrosis if it was present. However, he noted that the claimant was currently not really interested in any treatment, and he stated that he does not think that there is any reason to consider the claimant's situation dangerous in any way that would necessitate more aggressive treatment. This leads one to conclude that the claimant's alleged pain is not as bad as she would have one believe."

(Tr. 16-17).

### b. Case Law and Analysis for Listed Impairment

Plaintiff contends the ALJ erred by failing to find that Plaintiff met the requirements for Listing 1.04(C). Pl. Br. at 9, Doc 8. However, the ALJ throughly evaluated the hearing testimony; medical history; activities of daily living; opinion evidence; and credibility to determine whether Plaintiff met the criteria for a listed impairment. The record shows Plaintiff is able to ambulate with a cane, which is insufficient to meet Listing 1.04(C).

"Listing 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and <u>resulting in inability to ambulate effectively, as defined in 1.00B2b</u>." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04 (emphasis added).

Section 1.00B2b states:

"What We Mean by Inability to Ambulate Effectively (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes

very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a handheld assistive device(s) that limits the functioning of both upper extremities. (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The inability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." 20 C.F.R. pt. 404, subpt. P., app. 1, Section 1.00B2b (emphasis added).

In Morrison v. Comm'r of Soc. Sec., 355 F. App'x 599 (3d Cir. 2009), the Court held that substantial evidence supported the ALJ's finding that the plaintiff's impairment did not result in her inability to ambulate effectively. Id. at 601. The Court noted that the plaintiff did not meet the requirements of § 1.04C because she had a negative straight leg-raising test, normal strength in her lower extremities, and a normal range of motion. Id. at 601. The plaintiff's doctor, noting that the plaintiff walked without an assistive device, also observed that the plaintiff had no atrophy in her lower extremities and no restricted hip rotation. Id. Based on this evidence, the Court affirmed the ALJ's conclusion that the criteria of § 1.04C were not met. Id.

In Bullock v. Comm'r of Soc. Sec., 277 F. App'x 325, 328 (5th Cir. 2007), the Court held

that the plaintiff failed to show she was unable to ambulate effectively, as defined in § 1.00B2b, because she was able to walk with the help of a single cane, as opposed to a walker, two crutches or two canes. Furthermore, the plaintiff was able to climb stairs with the use of a handrail and she reported to her doctor that she could walk two blocks at one time. Id. at 328. The Court concluded that the ALJ's decision that she did not meet the requirements of the Listings was supported by substantial evidence. Id.

Here, the treatment records from Dr. Knaub and her physical therapist show Plaintiff can ambulate effectively with the use of a single cane and can climb steps with the use of a handrail. On March 11, 2008, Plaintiff's physical therapist reported that she ambulated primarily with the use of a single point cane (Tr. 217). He further indicated that she could ambulate up to 13 minutes within the department (Tr. 217). On March 13, 2008, Plaintiff reported to Dr. Knaub's nurse that she was walking with the assistance of a cane outside of her house and getting around inside the house without the cane (Tr. 266). In April 2008, Plaintiff reported to her physical therapist that she was standing, walking and doing laundry the previous Saturday (Tr. 223). On April 15, 2008, Plaintiff reported to her physical therapist a standing and walking tolerance of 15 minutes (Tr. 219). On May 15, 2008, Dr. Knaub encouraged Plaintiff to be as active as possible and informed her she could continue her activities as tolerated without restrictions (Tr. 239).

Additionally, the medical evidence documents Plaintiff's physical ability to ambulate. On examination in May 2009, Plaintiff had a normal lordotic curve without any paravertebral muscle spasm (Tr. 292). She also displayed normal 20 degrees of lateral flexion and normal 45 degrees of lateral rotation, which is hip motion (Tr. 292). She had a negative straight leg-raising test from the sitting position, her sensory system was normal, and her patella and Achilles reflexes were brisk and equal bilaterally (Tr. 292). Finally, Plaintiff showed excellent muscle strength in all directions of

both lower extremities and no fasciculation, weakness, or atrophy (Tr. 292).

Plaintiff bears the burden of showing she meets the requirements of Sections 1.04C and 1.00B2b. 20 C.F.R. § 404.1512(a) (providing that a claimant bears the burden of providing sufficient evidence to establish entitlement to disability); see also Dorf v. Bowen, 794 F.2d 896, 900 (3d Cir. 1986); Brown, 845 F.2d at 1213. In an attempt to meet that burden, Plaintiff states she needs a cane to ambulate. (Pl.'s Brief at 6). However, under the regulations, in order to meet the definition of ineffective ambulation, Plaintiff must show the inability to walk without two canes, not one. 20 C.F.R. pt. 404, subpt. P., app. 1, Section 1.00B2b. Given her testimony that she only uses one cane to ambulate, Plaintiff fails to meet her burden of showing an inability to ambulate.

### c. ALJ's Credibility Determination

Plaintiff contends the ALJ erred by discounting her credibility. Pl. Br. at 7-8, Doc 8. The ALJ reviewed the record to evaluate Plaintiff's credibility.

### (1) ALJ Review and Findings for Plaintiff's Credibility

"The claimant testified and stated in the record that she became disabled on January 15, 2009 due to spinal stenosis, degenerative arthritis, and sciatic nerve problems resulting in difficulty bending, stooping, standing, walking, pushing, pulling, and climbing stairs. She alleged that she has fallen several times, that her legs would give out at any time, and she would go down. She reported in the record that she started using a cane to help balance herself. She asserted that the sciatic nerve in the left leg is constantly hurting and weak and that while sleeping, she is awakened with leg pain. She indicated that she has had fusion surgery and has four screws in her back. The claimant alleged that she was in constant pain even with medication and that it is very difficult sitting for any length of time. She stated that when she was working she would go home and lie down for 1-2 hours to try to relieve back and leg pain daily. Again, she alleged that when she goes to sleep with the help of

medications, the pain still awakens her. The claimant indicated that she is depressed because of her situation. The claimant alleged that her conditions result in limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, understanding, following instructions, and using her hands. She reported in the record that she uses a cane and a walker. She noted in the record that she does not use a brace or a TENS unit but that she has used physical therapy and hot showers to relieve pain. The claimant testified that she received unemployment and noted that she received her last check from unemployment on June 17, 2010. She stated that she was terminated from her job on January 15, 2009 when the company shut down and everyone was laid off. The claimant said that she was required to tell unemployment that she was able to work and was available for work and added that she felt that she could work three to four hours per week doing customer service. She stated that she did not tell unemployment this but indicated that this is what she believed in her mind that she was able to do. She noted that she received severance pay through the end of March 2009. The claimant testified that she was receiving physical therapy and noted that she was being charged $20.00 per session and that this was not working, so she stopped it. She added that her most recent injections for her back were prior to her surgery on January 30, 2008. She asserted that the fusion did not take and that her operation was not a success and added that she is not interested in any treatment because it was not a success the first time and may not be a success the second time. She testified that she uses a cane at all times in the right hand." (Tr. 14).

"She testified that on a typical day in fall 2009, she would get up at 10:00 a.m., go wash up, brush her teeth, go downstairs, get cereal, go in the living room, sit down, and watch television. She indicated that she would go back upstairs at 1:00 p.m. and lie down until 5:00 p.m. and then go back downstairs. She indicated that when lying down upstairs, the television was on, and she was just

resting. The claimant noted that she would then watch television until about 6:00, get something to eat, and go back upstairs about 8:00 p.m. and would go to bed around 11:00 p.m. She said that she watched television about eight hours per day and would do nothing other than just lie down. She testified that her son and daughter help with household chores, that her sister and daughter help with cooking, that her family does grocery shopping, and that her daughter does the laundry." (Tr. 15).

"Marian D. Thomas, a friend of the claimant's, completed a Function Report Adult (Third Party) on April 29, 2009 and basically corroborated the statements of the claimant." (Tr. 15).

"Allegations concerning symptoms and limitations are undermined by the relatively benign clinical and laboratory findings and the limited degree of treatment required. In terms of recent treatment, it is conservative in nature and essentially limited to the use of medications. The claimant has required no recent intensive / extensive treatment such as repeat surgical intervention, emergency room treatment, or inpatient hospitalization. In fact, the claimant testified that she has had no injections since her January 30, 2008 L4-L5 laminectomy and L4-L5 fusion surgery and noted that she is not interested in further treatment because the first surgery did not work. Furthermore, she also testified that she was attending physical therapy, which was costing her $20.00 a session and that she stopped this because she did not think it was effective. Considering the above, it is reasonable to conclude that pain is not really as limiting as the claimant would have one believe, as it is reasonable to expect that she would exhaust available treatment measures in an effort to alleviate pain if that were the case. It is also interesting to note that the claimant admitted at the hearing that she was terminated from her job as of January 15, 2009, which is also her alleged onset date. The reason for termination was that the company shut down and everyone was laid off. Thus, it is reasonable to conclude that the claimant probably would have continued working in light of the fact that she did not quit due to her impairment. It should also be noted that she received unemployment

compensation after being terminated from employment on January 15, 2009; and in order to do this, she represented that she was able and available to work. It is also interesting to note that she returned to work full-time on May 5, 2008, which was only about four months after her January 30, 2008 surgery. This suggests that surgical intervention was effective relatively quickly." (Tr. 15-16).

"As for the effectiveness of treatment, it is reasonable to conclude that treatment is effective in light of the fact that no alternative treatment has been sought or recommended." (Tr. 17).

"While the claimant alleged rather significant restriction of activities of daily living, as discussed more thoroughly above, there is no basis in the record for such significant restrictions in light of the relatively benign clinical and laboratory findings and limited degree of treatment required." (Tr. 17).

### (2) Case Law and Analysis for Plaintiff's Credibility

When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. SSR 96–7p, 61 Fed. Reg. 34483 (July 2, 1996). In particular, an ALJ should consider the following factors: (1) the plaintiff's daily activities; (2) the duration, frequency and intensity of the plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's prior work record; and (8) the plaintiff's demeanor during the hearing. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); Jury v. Colvin, No. 3:12-cv-2002, 2014 WL 1028439 (M.D. Pa. Mar. 14, 2014). When the Court reviews the ALJ's decision, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Walters v.

Commissioner of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997) (citing Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.")). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

Plaintiff contends the ALJ erred by discounting Plaintiff's credibility. Pl. Br. at 7-8, Doc 8. However, the ALJ reviewed the record and found Plaintiff's testimony of extreme pain differed from the evidence in record. Plaintiff requested to be discharged from physical therapy because she had no pain within her legs but continued to have low back pain after cleaning and ambulation. The ALJ noted Plaintiff testified that others assisted her with her cleaning / housework. (Tr. 16).

Plaintiff testified to severe pain but Dr. Goodman noted that the only drug she was taking now by prescription was Naproxen. (Tr. 16). In addition, Dr. Knaub discussed treatment options with Plaintiff including the possibility of epidural injections and surgery to correct pseudoarthrosis if it was present. However, Plaintiff was not interested in any treatment, and Dr. Knaub stated he does not think that there is any reason to consider Plaintiff's situation dangerous in any way that would necessitate more aggressive treatment. The ALJ found that this shows Plaintiff's alleged pain is not as bad as she would have one believe (Tr. 17).

The ALJ noted Plaintiff's conservative treatment limited to the use of medications and no recent surgeries, emergency room treatment, or inpatient hospitalization, and Plaintiff has not received injections since January 2008. (Tr. 15). The ALJ also noted Plaintiff returned to work four months after surgery and the only reason Plaintiff left her job was due to being laid off and not due her impairments. (Tr. 16). The ALJ concluded Plaintiff's treatment must have been effective since

no alternative treatment has been sought or recommended. (Tr. 17).

Plaintiff also argues the ALJ incorrectly found Plaintiff stopped physical therapy because it was not working instead of due to finances. Pl. Br. at 7-8, Doc 8. However, the ALJ noted that Plaintiff testified about the cost of $20 per session to attend physical therapy. (Tr. 15-16).

Plaintiff contends it is unreasonable for the ALJ to expect her to exhaust all treatment measures. Pl. Br. at 7, Doc 8. However, treatment is one of the factors the ALJ considers pursuant to the regulations. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### d. ALJ Consideration for Plaintiff's Obesity

Plaintiff states the ALJ erred by failing to account for Plaintiff's obesity. Pl. Br. at 7-8, Doc 8. The ALJ reviewed the record to consider Plaintiff's obesity at steps two and three of the sequential evaluation process (Tr. 12-13).

 "While the claimant has obesity and testified that she is five feet three and one-half inches tall and weighs 217 pounds, she did not allege any restrictions / limitations arising from that condition. Moreover, the medical evidence of record does not support a finding that she suffers from more than minimal limitations of function as a result of obesity. Thus, obesity is a non-severe impairment." (Tr. 12).

"There is no specific Listing for obesity, and there is no indication in the record that the claimant's obesity increases the severity of the claimant's coexisting impairment to the extent that the combination of impairments meets the requirements of a Listing." (Tr. 13).

Plaintiff failed to allege the effect of her obesity on her conditions or allege functional limitations as a result of her obesity, and the ALJ properly considered her obesity in the decision. See Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

//

### e. ALJ Review of Consultative Medical Examiner

Plaintiff contends the ALJ erred in evaluating the assessment of the consultive orthopedic examiner, Bruce Goodman, M.D. Pl. Br. at 8, Doc 8. The ALJ reviewed the opinions in conjunction with the medical evidence in the record.

"The [ALJ] has also accorded significant weight to the June 16, 2009 assessment of the State agency medical consultant finding that the claimant retains the capacity for the full range of light work as such assessment is generally consistent with and well supported by the clinical findings and treatment history. However, in order to be most fair to the claimant, the [ALJ] has assessed the claimant as having additional postural and manipulative limitations and limited her to less than the full range of light work. The [ALJ] has accorded limited weight to the May 20, 2009 assessment of Bruce Goodman, M.D., the consultative orthopedic examiner, limiting the claimant to no more than sedentary work with a sit / stand option, as Dr. Goodman's assessment was based on a single examination of the claimant. Moreover, Dr. Goodman's assessment is somewhat out of proportion to his own relatively benign clinical findings, which establish that straight leg raising was negative in the seated position, there was no paravertebral muscle spasm, there was no great toe weakness, there was no atrophy, sensation was intact, reflexes were brisk and equal bilaterally, and there was excellent muscle strength in all directions of both lower extremities." (Tr. 17).

### (1) Case Law and Analysis for ALJ Review of Consultative Medical Examiner

The weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion. 20 C.F.R. § 404.1527(c)(4). A treating physician's opinion does not warrant controlling weight under the regulations unless it is well

supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); Plummer, 186 F.3d at 429. If a treating source's opinion is not entitled to controlling weight, the factors outlined in 20 C.F.R. § 404.1527(c)(2) are used to determine the weight to give the opinion. Id. The more a treating source presents medical signs and laboratory findings to support his medical opinion, the more weight it is entitled. Id. Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. Id. The Commissioner is not bound by a treating physician's opinion, and may reject it, if there is a lack of clinical data supporting it, or if there is contrary medical evidence. Lyons-Timmons v. Barnhart, 147 F. App'x 313, 316 (3d Cir. 2005).

The ALJ, not the treating or examining physician, must make the disability and residual functional capacity determination. 20 C.F.R. § 404.1527(d)(1)-(2); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356 (3d Cir. 2011). "The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Chandler, 667 F.3d at 361; Coleman v. Astrue, 2012 WL 3835403, at *2 (3d Cir. Sept. 5, 2012) (holding that ALJ may choose non-examining physician opinion over treating physician opinion as long as medical evidence not rejected for wrong reason or no reason).

The case law in this circuit makes clear that physician opinions are not binding upon an ALJ, and that an ALJ is free to reject a medical source's conclusions. Chandler, 667 F.3d 356 at 361. In so doing, however, the ALJ must indicate why evidence was rejected, so that a reviewing court can determine whether "significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981). Mistick v. Colvin, No. 12-cv-1031, 2013 WL 5288261 (W.D. Pa. Sept. 18, 2013).

In Chandler v. Comm'r of Soc. Sec., 667 F.3d at 362, the Third Circuit held that the district

court had erred in concluding that the "ALJ had reached its decision based on its own improper lay opinion regarding medical evidence." Id. "The ALJ– not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Id. at 361 (citing 20 C.F.R. 404.1527(e)(1), 404.1546(c)).

"[T]he ALJ is not bound to accept every limitation that is found by a medical professional, but rather only the ones that she finds are credibly established by the record. See Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 147 (3d Cir. 2007). Contrary to Plaintiff's assertion, the ALJ did not err by incorporating into her RFC finding only those limitations which she found to be credibly established by the objective medical evidence and the Court finds that the ALJ's RFC determination as well as her ensuing hypothetical to the vocational expert both enjoy the support of substantial record evidence. Finally, the Court finds that the ALJ evaluated the medical opinion evidence properly and in accordance with the applicable rules and regulations and that substantial record evidence supports her evaluation. The ALJ gave a detailed explanation for why the medical source statements from the mental health providers were not given controlling weight the ALJ discussed at length her justification for why the medical source statements from Dr. Jahangeer and Ms. Walker were inconsistent with and contradicted by the other medical evidence of record, including their own notes and prior findings. The Court finds that the ALJ discharged her duty because she (i) demonstrated her consideration of all the relevant medical evidence, (ii) addressed the contradictory evidence in the record which conflicted with her findings, and (iii) explained why that contrary evidence was rejected or not given controlling weight. See Cotter, 642 F.2d at 705. Indeed, the overarching theme of the ALJ's decision was the complete lack of objective medical evidence which corroborated or even tended to support Plaintiff's complaints of severely disabling impairments and the Court agrees with the ALJ's finding that such corroborating evidence was woefully lacking in

the record. Plaintiff's subjective complaints were corroborated only by her own self-reports, which—for the reasons discussed by the ALJ—were not particularly credible. To that end, the Court finds that the ALJ's credibility determination is well-supported by the record and that Plaintiff's arguments to the contrary are completely unpersuasive, particularly given the minimal treatment record, the inconsistencies in the record that were highlighted and discussed by the ALJ . . . Accordingly, the Court concludes that substantial record evidence supports the ALJ's determination of non-disability." Stewart v. Astrue, No. 13–73, 2014 WL 29035, at *1, n.1 (W.D. Pa. Jan. 2, 2014).

Similarly in this case, the record does not support Plaintiff's assertions of disabling severity. Plaintiff's contentions of error are inconsistent with the objective evidence and activities of daily living. From the ALJ's extensive review, substantial evidence supports the weight accorded to the allegations and opinions of record.

Therefore, the ALJ's finding that Plaintiff's impairments did not rise to the disabling level necessary to meet a listing was supported by substantial evidence.

**2.    The ALJ's Determination Plaintiff Could Perform Past Relevant Work**

Plaintiff contends the ALJ erred in finding Plaintiff's residual functional capacity by determining Plaintiff could perform her past work. Pl. Br. at 11, Doc. 8. The ALJ evaluated the record before determining Plaintiff's residual functional capacity.

"After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform light work (which entails lifting / carrying / pushing / pulling 20 pounds occasionally and 10 pounds frequently, standing 6 hours per 8-hour workday, walking 6 hours per 8-hour workday, and sitting 6 hours per 8-hour workday) with normal breaks to include ten to fifteen minute break, a thirty minute break, and another ten to fifteen minute break as defined in 20 C.F.R. § 404.1567(b) except she can only occasionally climb stairs, stoop (bending waist level

and lower), crouch or squat, reach overhead with the bilateral upper extremities, and tolerate concentrated exposure to wetness, water, and liquids; she must never climb rope, ladders, scaffolding, or poles, crawl (on hands and knees or feet), be exposed to extreme cold, work on large vibrating objects or surfaces, work in high exposed places, work around fast moving machinery on the ground, or work around or with toxic or caustic chemicals; and she must be able to sit / stand at will." (Tr. 13).

In limiting Plaintiff to a reduced range of light work with a sit / stand option, the RFC accounted for Plaintiff's credibly established limitations.

Plaintiff argues her past relevant work as an order clerk at Williams-Sonoma in customer service for their catalogue business was so modified to her impairments as to make the job no longer available. Pl. Br. at 11, Doc 8.

Pursuant to 20 C.F.R. § 404.1566(c), Plaintiff's inability to get work in her prior position is not considered. Section 404.1566(c) states:

Inability to obtain work. We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of (1) Your inability to get work; (2) Lack of work in your local area; (3) The hiring practices of employers . . . (6) No job openings for you; (7) You would not actually be hired to do work you could otherwise do . . ." 20 C.F.R. § 404.1566(c).

Plaintiff states the ALJ should have analyzed Plaintiff under Grid Rule 202.04. Pl. Br. at 11, Doc. 8. However, since substantial evidence supports the ALJ's finding that Plaintiff could perform a limited range of light work with a sit / stand option, Grid Rule 202.04, would not apply.

Moreover, the Grid rules are not relevant because the ALJ found Plaintiff could not perform

the full range of light work. (Tr. 13). 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 202.00. Thus, the ALJ

employed a VE to determine the extent to which the Plaintiff's functional limitations eroded the

occupational base (Tr. 18). The VE determined that an individual with the Plaintiff's age, education,

work experience, and RFC could still perform past work existing in significant numbers in the

national economy and, thus, the ALJ found that Plaintiff was not disabled (Tr. 18).

Thus, the ALJ's RFC finding includes only "credibly established limitations" and not all

impairments alleged by claimant, Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).

Accordingly, the ALJ relied on the record and testimony in determining Plaintiff's residual

functional capacity, and the findings are supported by substantial evidence.

## V.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in

determining whether Plaintiff met the criteria for disability, and the findings were supported by

substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at

200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d

at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere

scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson

v. Perales, 402 U.S. 389, 401 (1971).

Thus, if a reasonable mind might accept the relevant evidence as adequate to support the

conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is

supported by substantial evidence and stands. Monsour Med. Ctr., 806 F.2d at 1190. Here, a

reasonable mind might accept the evidence as adequate, and the Court will affirm the decision of the

Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate order in accordance with this memorandum to deny Plaintiff's appeal will follow.

Dated: August 15, 2014                                s/Gerald B. Cohn
                                                GERALD B. COHN
                                     UNITED STATES MAGISTRATE JUDGE